# UNITED STATES DISTRICT COURT
for the
Northern District of California

| | |
|---|---|
| United States of America<br>v.<br><br>JUNWEI GUO<br><br><br>*Defendant(s)* | )<br>)<br>)  Case No. **CR 26-70083-MAG**<br>)<br>)<br>)<br>) |

**FILED**

Feb 02 2026

Mark B. Busby
CLERK, U.S. DISTRICT COURT
NORTHERN DISTRICT OF CALIFORNIA
SAN JOSE

## CRIMINAL COMPLAINT

I, the complainant in this case, state that the following is true to the best of my knowledge and belief.
On or about the date(s) of __November 9, 2025__ in the county of __Santa Clara__ in the
__Northern__ District of __California__, the defendant(s) violated:

| Code Section | Offense Description |
|---|---|
| Count 1:<br>49 USC 46307<br>(Class A Misdemeanor) | Violation of National Defense Airspace<br><br>Maximum Penalties:<br>1 year of imprisonment<br>1 year of supervised release<br>$100,000 fine<br>$25 mandatory special assessment fee |

This criminal complaint is based on these facts:

See attached affidavit of FBI Special Agent Hannah Broughton.

☑ Continued on the attached sheet.

Approved as to form ___/s/___
           AUSA Christina Liu

/s/
*Complainant's signature*

Hannah Broughton, FBI Special Agent
*Printed name and title*

Sworn to before me by telephone.

Date: 1/30/2026

*Judge's signature*

City and state: San Jose, California

Hon. Nathanael Cousins, U.S. Magistrate Judge
*Printed name and title*

## AFFIDAVIT FOR CRIMINAL COMPLAINT

I, Hannah Broughton, a Special Agent with the Federal Bureau of Investigation, being duly sworn, state:

## INTRODUCTION AND PURPOSE OF AFFIDAVIT

1. This affidavit is made in support of a criminal complaint against JUNWEI GUO for knowingly and willfully violating U.S. National Defense Airspace, in violation of 49 U.S.C. § 46307.

2. The information in this affidavit is based on my personal knowledge, my review of documents and evidence collected during the investigation, my training and experience, and information obtained from witnesses and from other agents and agencies. Because this affidavit is submitted for the limited purpose of establishing probable cause in the application of a criminal complaint, it does not set forth each and every fact that I or others have learned during the course of this investigation.

## AGENT BACKGROUND

3. I am a Special Agent (SA) of the Federal Bureau of Investigation (FBI) and have been employed by the FBI for six years. During my training at the FBI Academy, Quantico, Virginia, I received training in a variety of investigative and legal matters, including the topics of Fourth Amendment searches, the drafting of search warrant affidavits, arrest warrant affidavits, criminal complaints, and probable cause. The academy covered all aspects of federal led investigations, including but not limited to drug investigations, physical and electronic surveillance, utilization of confidential sources, interview techniques, undercover operations, physical surveillance, constitutional rights, the execution of search warrants, and working with confidential sources. Currently, I am assigned to the San Francisco FBI Field Office, and I have been assigned investigations of various crimes and federal offenses including crimes within the airport and aviation environment.

## APPLICABLE LAW

### Definitions

4. Title 49 ("Transportation"), United States Code, Sections 40102 and 44801 define the following terms used in this affidavit:

   a. "Aircraft" means any contrivance invented used, or designed to navigate, or fly in, the air.

   b. "Unmanned aircraft" means an aircraft that is operated without the possibility of direct human intervention from within or on the aircraft.

   c. "Small unmanned aircraft" means an unmanned aircraft weighing less than 55 pounds, including the weight of anything attached to or carried by the aircraft.

   d. "Unmanned aircraft system" (UAS) means an unmanned aircraft and associated elements (including communication links and the components that control the unmanned aircraft) that are required for the operator to operate safely and efficiently in the national airspace system.

### Background and Applicable Law

5. The Federal Aviation Administration (FAA) is an agency within the United States Department of Transportation responsible for maintaining the safety and efficiency of the navigable airspace within the United States. The FAA created the National Airspace System (NAS) to protect persons and property on the ground, and to establish a safe and efficient airspace environment for civil, commercial, and military aviation. In the FAA Modernization and Reform Act of 2012, the FAA was charged with safely integrating unmanned aircraft systems (UAS), commonly referred to as "drones," into the NAS.

6. Title 49 ("Transportation"), United States Code, Section 40103(b)(3) requires the Administrator of the FAA, in consultation with the Secretary of Defense, to establish areas in the airspace the Administrator decides are necessary in the interest of national defense; and by regulation or order, restrict or prohibit flight of civil aircraft that the Administrator cannot

identify, locate, and control with available facilities in those areas. A temporary flight restriction (TFR) is issued, pursuant to regulation, that temporarily restricts certain aircraft from operating within a defined area in order to protect persons or property in the air or on the ground.

7. Pursuant to § 40103(b)(3), on January 27, 2024, the FAA issued a TFR that prohibits all aircraft—including small unmanned aircraft systems (drones)—from operating within a three nautical mile radius of any stadium with a seating capacity of 30,000 or more people during, among other events, regular or postseason National Football League (NFL), NCAA Division I football, and Major League Baseball games. The TFR, also referred to as the "stadium TFR," takes effect one hour before a qualifying event begins and remains in effect until one hour after the event ends.  Pursuant to § 40103(b)(3), the FAA classifies the airspace defined in the stadium TFR as "National Defense Airspace."

8. The FAA provided notice of this stadium TFR to the public via its Notice to Airmen (NOTAM) # FDC 0/0367.  Members of the public are able to access this and other NOTAMs on the FAA's website and through the FAA's B4UFLY services.  The B4UFLY services provide situational awareness to drone flyers and show where recreational flyers can and cannot fly their drones.  Members of the public can access these B4UFLY services through desktop and mobile applications provided by FAA approved service providers.

9. Title 49, United States Code, Section 46307 prohibits a person from knowingly or willfully violating 49 U.S.C. § 40103(b)(3), or a regulation prescribed or order issued under § 40103(b)(3).

**Facts Supporting Probable Cause**

10. Junwei Guo ("GUO") resides in San Francisco, California.

*November 9, 2025:  Levi's Stadium*

11. Levi's Stadium is located in Santa Clara, California, and is home of the San Francisco 49ers, a professional football team in the NFL.  Levi's Stadium has a seating capacity

3

of about 68,500 people, and is located within five miles of both San Jose International Airport and Moffett Federal Airfield.

12. On November 9, 2025, the San Francisco 49ers hosted the Los Angeles Rams at Levi's Stadium for a National Football League game that started at 1:25 p.m. The stadium TFR, noticed to the public through NOTAM # FDC 0/0367, was in effect during this NFL game.

13. During the game and at approximately 4:15 p.m., law enforcement began receiving UAS sensor data indicating that a UAS with serial number 1581F67QE23CN00A003A was flying approximately 2.7 miles from Levi's Stadium, which was within the three nautical mile radius covered by the stadium TFR. This set of UAS sensor data identified the following approximate geographic coordinates for the pilot location, homepoint location, and drone location:[1]

    a. Pilot Location: 37.4391479002223, -121.960386418076

    b. Homepoint Location: 37.43918227769, -121.960065561711

    c. Drone Location: 37.4399099340898, -121.986587778047

---

[1] Based on my training, experience, consultation with other experienced officers, and knowledge of this investigation that the "pilot location" is the UAS operator's location; the "drone location" is the UAS's location; and the "homepoint location" is the UAS's launch location and where the UAS will automatically return upon landing, unless the UAS operator manually updates the homepoint location to another landing destination.

14.     At around this time, monitoring agents received UAS sensor data from one set of UAS sensors that detected the UAS and the approximate altitudes during its flight, as shown below.[2] Based on my training, experience, consultation with other experienced officers, and knowledge of this investigation, I understand that law enforcement agents commonly use this type of UAS sensor data to detect, track, and monitor UASes flying in restricted airspace; to locate and approach the UAS operator; to address public safety concerns; and to advance investigations into UAS violations. I understand that agents investigating UAS violations have used and found this type of UAS sensor data reliable in their enforcement operations and case investigations.

| Date and Approximate Time of Detection | Approximate Altitude Above Ground Level (in Feet) |
|---|---|
| 11/9/2025 16:15 | 1544.291 |
| 11/9/2025 16:16 | 1543.963 |
| 11/9/2025 16:20 | 2336.942 |
| 11/9/2025 16:21 | 1917.323 |
| 11/9/2025 16:21 | 1927.494 |
| 11/9/2025 16:21 | 1937.336 |
| 11/9/2025 16:21 | 2006.89 |
| 11/9/2025 16:22 | 1716.535 |

In this case, this set of UAS sensor data first detected this UAS at around 4:15 p.m. and flying at approximately 1,500 feet above ground level. Within about five minutes, it had flown up to height of about 2,300 feet, after which it flew to heights between 1,900 and 2,000 feet, before flying to about 1,700 feet in the next minute or so afterward. I understand from my training, experience, consultation with other experienced officers, and knowledge of this investigation that

---

[2] This set of UAS sensor data was associated with a summary report, generated by the third-party company providing UAS sensor equipment, that included the company's own assessment of the UAS's "risk score" and the UAS's historical record of flight violations, as determined by the company's own proprietary analysis. The summary report stated that this UAS had incurred three "FAA Celing [sic] Violation[s]," zero "TFR Violation[s]," and three "FAA Facility Violation[s]." At this time, I do not have knowledge of how the third-party company made these determinations or the information that it considered in making these determinations.

a UAS flying at such heights raises significant public safety concerns and could potentially disrupt air traffic control for manned aircraft and other aircraft.

15. Agents later received UAS sensor data from a second set of UAS sensors that detected a UAS with the same serial number, flying in the approximate range of 0 to 62.5 feet above ground level, during an approximate ten second period between 4:26 p.m. and 4:27 p.m.

16. At around 4:30 p.m. on November 9, 2025, I and another agent arrived to the pilot location in the vicinity of Don Edwards San Francisco Bay Wildlife Refuge near 1571 Grand Boulevard, San Jose, CA 95002 and encountered GUO. I observed that GUO was standing in an open area and holding an item that I identified as a small UAS controller. GUO admitted that he was flying a drone.

17. I and the other agent instructed GUO to land the drone. I observed GUO operating the small UAS controller in his hands and, shortly thereafter, a small UAS landed in the vicinity of GUO.

18. I and the other agent asked GUO for the serial number of the small UAS. I observed GUO remove the battery from the small UAS to reveal the serial number. I observed the small UAS to be a DJI Mavic 3 Pro drone with UAS serial number 1581F67QE23CN00A003A, which I recognized as the same serial number for the small UAS that law enforcement agents had detected.

19. GUO provided identifying information for himself. GUO admitted that he did not have a UAS Remote Pilot Certificate. I know, based on my training, experience, consultation with other experienced agents, and knowledge of this investigation, that all operators flying a UAS must obtain a UAS Remote Pilot Certificate from the FAA before flying the UAS under the FAA's Small UAS Rule (Part 107). The Remote Pilot Certificate demonstrates that the operator understands the regulations, operating requirements, and procedures for safely flying drones. To obtain a Remote Pilot Certificate, operators must be in a physical and mental condition to safely fly a drone, pass an aeronautical knowledge exam, and satisfy other requirements.

20.     GUO also admitted that he did not have a recreational operator TRUST completion certificate. I know that UAS operators who fall under the recreational use exception under 49 U.S.C. § 44809(a) may satisfy the aeronautical knowledge and safety test requirement by taking and passing the Recreational UAS Safety Test (TRUST), based on my training, experience, consultation with other experienced agents, and knowledge of this investigation.

21.     GUO admitted that he did not register this drone with the FAA. GUO claimed that he was flying his drone for recreation because he wanted to get camera views like the ones he had seen on YouTube. At around this time, two other law enforcement agents arrived on scene.

22.     GUO admitted that he had not obtained airspace authorization or waiver to fly his drone at that place or at that time.

23.     Another agent asked if GUO could turn the remote controller off and on again. That agent observed GUO appear to turn the remote controller off, wait a few seconds, and turn the remote controller on again. Although that agent did not observe a pre-flight advisement appear on the screen of the remote controller during this process, GUO admitted that right before he launched the drone that afternoon, he remembered that a warning message did pop up on the remote controller screen. According to GUO, the warning message advised him to comply with federal and state laws, and GUO selected the "agree" option.

24.     GUO initially told agents that he flew the drone up to around 1,500 to 2,000 feet high. GUO admitted that he was not able to maintain a visual line-of-sight of the drone, and that he looked down at the controller to operate the drone when he could no longer see the drone.

25.     Another agent informed GUO that the maximum permitted altitude for a UAS was 400 feet. GUO then claimed that the maximum altitude that he flew the drone was closer to 500 or 600 feet.

*Subsequent Investigation*

26.     Subsequently, based on an FAA records check conducted in connection with this matter, and on my training, experience, consultation with the FAA and with experienced officers, and my knowledge of this investigation, I confirmed that GUO did not have FAA authorization

to fly a small UAS in the vicinity of Levi's Stadium on November 9, 2025. I also confirmed that GUO did not register for a Remote Pilot's Certificate with the FAA and had not registered this drone with the FAA.

## **CONCLUSION**

27. Based on the foregoing, I respectfully submit that probable cause exists to believe that JUNWEI GUO violated Title 49, United States Code, Section 46307 by knowingly and willfully violating U.S. National Defense Airspace.

_____
Hannah Broughton
Special Agent
Federal Bureau of Investigation

Sworn over the telephone and signed by me pursuant to Fed. R. Crim. P. 4.1
on this _30_ day of January 2026.

_____
THE HONORABLE NATHANAEL COUSINS
United States Magistrate Judge